**IN THE UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

LISA K. MULLEN,

               Plaintiff,

v.                                        CIVIL ACTION NO. 3:08-0107

DR. FRANCIS J. HARVEY,
SECRETARY OF THE ARMY,
ARMY CORPS OF ENGINEERS,
HUNTINGTON DISTRICT,

               Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending are both the Defendant's Motion for Summary Judgment (Doc. 75) and the Plaintiff's Motion for Leave to File A Sur-Reply (Doc. 92). The Court has read and considered all of the applicable filings and, therefore, **GRANTS** the Plaintiff's Motion for Leave to File a Sur-Reply. Even so, the Court **FINDS** that the Plaintiff has failed to provide sufficient evidence to support her claims; as such, the Court **GRANTS** the Defendant's Motion for Summary Judgment.

Also pending is Plaintiff's Motion for Reconsideration (Doc. 104). Through this motion, Plaintiff argues that the Court made improper determinations of fact during the pre-trial hearing and in reaching its judgment. The Court has considered the facts in the light most favorable to Plaintiff, as it is required to do on summary judgment. As such, the motion to reconsider is **DENIED**.

**Standard of Review**

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the Court will not "weigh the evidence

and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, an evidentiary showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The claims brought by Plaintiff in this Court were originally heard and considered by the Equal Opportunity Employment Commission ("EEOC"). That administrative agency made its own factual and legal analysis of the issues presented and issued decisions announcing them. In considering this case the Court is not bound by any prior decision of the EEOC or other administrative proceeding. Rather, it is well settled that review of the claims and evidence is *de novo*. *Rao v. County of Fairfax, Va.* 108 F.3d 42, 44 (4th Cir. 1997).[1]

---

[1]There is a dispute amongst the parties about the extent to which they may rely on material from the EEOC as well as from an arbitrator who initially heard many of Ms. Mullen's claims. The Court understands that under the guidance of U.S. Supreme Court dicta there are "no standards as to the weight to be accorded an arbitral decision" and that the consideration of such decision "must be determined in the court's discretion with regard to the facts and circumstances of each case." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974). In this case the Court is unwilling to rely heavily on the arbitrators decision as the Court does not have access to transcripts of proceedings or other evidence before that arbitrator. It is unclear what evidentiary standards and procedural safeguards were implemented. In contrast the Court does have access to transcripts of some of the administrative hearings before the EEOC It will consider these competent evidence.

(continued...)

## Background

Plaintiff, Ms. Mullen, filed this action seeking review of two separate decisions by the EEOC.  On February 15, 2008, she filed a challenge to the first decision – which concluded that the U.S. Army Corps of Engineers ("Corps") did not discriminate against her when it denied her request for a designated parking space.  On July 23, 2008, she amended her complaint to incorporate a challenge to a second EEOC decision – which concluded that she was not an individual with a disability pursuant to the Rehabilitation Act of 1973 and, therefore, did not have a viable claim for a hostile work environment.

Ms. Mullen's claims, and her physical limitations,[2] originated with a 1989 workplace injury.  She stepped on a nail and suffered permanent nerve damage in her foot.  Since that time, Ms. Mullen has walked with a limp and has used a cane for assistance.  On April 1, 1993, Ms. Mullen signed a negotiated settlement agreement to resolve an EEOC complaint against the agency in regard to her injury.  Pursuant to this agreement, the agency allowed Ms. Mullen to spend the first and last forty minutes of her work day in sedentary activities.  It also required the agency to make a good faith

---

[1](...continued)

One of Defendant's arguments in support of summary judgment was that Plaintiff's evidence, proffered in response, was not competent under the standards of Fed. R. Civ. P. 56.  While the Court agrees that the complaint, amended complaint, and the arbitrator's findings and statements of fact  are insufficient proof at the summary judgment stage – there is sufficient evidence on the record, in the form of EEOC transcripts and depositions, that the citation to improper sources is not dispositive of Plaintiff's claims.  Most of the factual claims made by Plaintiff are supported in the record by competent evidence.

[2]The parties disagree on whether or not Ms. Mullen qualifies as an individual with a disability under the provisions of the Rehabilitation Act.  As explained below, the Court will assume without deciding that Ms. Mullen's meets that definition.  In order to be clear, however, that the Court is not ruling on that issue, this opinion will frequently refer to Ms. Mullen's "limitation" rather than her "disability."

effort to locate a parking space near the federal building.  Ms. Mullen agreed to schedule her day so that the requisite sedentary periods would be productive and to pay for any parking accommodation the Corps could arrange.  On February 21, 1995, the parties amended this settlement and agreed that the Corps would allow Ms. Mullen twice the time for work assignments in the field that it would allow for employees without physical limitation.

**I.  Equal Opportunity Employment Commission Case 1**

In December 2000, Ms. Mullen requested a designated parking space behind the Corps federal building.  Shortly thereafter, Ms. Mullen took a period of extended medical leave.  Upon her return, on May 16, 2001, she sent an email to Mark Lycan, the Manager of the Disabilities Program for the agency, to inform him she had returned to work and to request an update of her parking request.   The agency processed the request through the Human Resources Department, to ensure compliance with the Rehabilitation Act, and the agency's Logistics Management Office ("Logistics"), to ensure compliance with Title 41 of the Code of Federal Regulations.  During the processing of her request, Mr. Lycan repeatedly requested medical documentation of her condition. Ms. Mullen provided documentation from 1992, establishing a permanent "substantial limitation in walking."  (Def.'s Exh. C, Doc. 75-1) (emails between Mr. Lycan and Ms. Mullen).  Mr. Lycan responded that he did not question the permanency of her condition, but rather was asking for "specific functional limitations."  *Id.*  Ms. Mullen told him, by email, that she did not have anything recent.  On September 19, 2001, Mr. Lycan forwarded Ms. Mullen a memorandum denying her request for the parking spot because of her failure to provide requested medical information.  Mr. Lycan pointed out that the agency was already providing accommodation for her limitation through the 1993 and 1995 negotiated settlement agreements.  The next day, Annette Quinn, chief of

Logistics, sent Ms. Mullen a memorandum claiming that Ms. Mullen had not provided sufficient information to demonstrate that she met the definition of "severely handicapped employee." September 20, 2001 Memorandum (Def.'s Exh E, Doc. 75-1).

Ms. Mullen contends that her request for a designated parking space was doomed from the beginning and that submitting recent medical documentation would have been futile. While Ms. Mullen had temporary access to the space, Logistics twice deactivated her key. One of that office's employees stated in arbitration that he heard Ms. Quinn say that she did not believe Ms. Mullen needed the space. During the processing of Ms. Mullen's request, Mr. Lycan recommended that the handicap signs on the parking space requested by Ms. Mullen, and other nearby spaces, be removed. Ms. Mullen believed that this was a strong signal her request would be denied. (Mr. Lycan testified that this action was taken to avoid confusion. He felt the handicap signs implied the spaces were available for public use, which they were not.)

On January 14, 2002, Ms. Mullen filed a grievance over the decision. Colonel Rivenburgh made the final agency decision that Ms. Mullen's request would be denied for failure to submit current medical documentation to support her request. The union invoked arbitration and on June 10, 2003, the matter was heard before an arbitrator. Although the Court does not have the benefit of transcripts of that hearing, the arbitrator's final decision is clear. He found that Ms. Mullen did need and deserve the requested parking space to accommodate her physical disability.[3] *See American Federation of Government Employees, L. 3729 v. U.S. Army Corps of Engineers, Huntington District*, Slip Copy (June 10, 2003) (Skonier, Arb.). He ordered that it be provided at

---

[3]In contrast to this Court, the arbitrator did find that Ms. Mullen had a disability within the meaning of the statute. *Id.*

no cost to Ms. Mullen.  *Id.*  On related claims, of a hostile work environment, the arbitrator also found in Ms. Mullen's favor and ordered the agency to cease and desist.  *Id.* The arbitrator did not order compensatory damages.  *Id.*  The agency filed exceptions with the Federal Labor Relations Authority ("FLRA") to the portions of the arbitrator's decision finding that the Agency had failed to reasonably accommodate Ms. Mullen.  The FLRA set aside the arbitrator's finding of failure to accommodate and the award of the parking space.  Plaintiff appealed to the EEOC Office of Federal Operations, which affirmed the FLRA decision on November 16, 2007.

## II.  Equal Opportunity Employment Commission Case 2[4]

In the midst of the appeal of the first EEOC case, Ms. Mullen filed another formal complaint to the EOOC alleging the Corps continued to subject her to a hostile workplace.  (The arbitrator's decision had resolved the claims of earlier work-place discrimination to which the agency did not object.)  This new complaint was filed on November 21, 2005, and then supplemented with subsequent complaints on January 17, 2006, and September 14, 2006.  These complaints were consolidated for investigation and for a hearing, which took place on October 24-25, 2007.  The administrative law judge issued her decision on February 20, 2008, and an order entering judgment on February 22, 2008.  The Final Agency Decision (FAD) implementing the administrative law judge's decision was filed on April 7, 2008.

---

[4]Keeping in mind that the Court must undertake *de novo* review of the EEOC's findings, and view the evidence in the light most favorable to Ms. Mullens, it is necessary to review all of her allegations of discriminatory conduct.  The bulk of the record to support these allegations comes in the form of testimony at the EEOC hearing, transcripts of which are attached to the Defendant's motion for summary judgment.  In addition, Plaintiff has provided depositions from Ginger Mullen, herself, and certain employees of the agency.

During the hearing October 2007 hearing, Ms. Mullen testified as to the conduct of Betty Jackson, whom Ms. Mullen identified as a three-time offender.  Transcript of October 24, 2007 EEOC hearing ("EEOC Transcript") (Mullen direct). While it is not clear from hearing testimony what the first incident involved, the second incident occurred when Ms. Mullen was speaking with Ms. Jackson in the Corps restroom.  A fire drill was planned that day and Ms. Jackson, who was also mobility impaired at the time, questioned whether Ms. Mullen would have difficulty getting out at the time of the fire drill and if any special accommodations had been made for people with mobility impairments.  Ms. Mullen was offended by the conversation and filed a grievance.  The third instance was in retaliation for the other grievances.  Ms. Mullen complained that Ms. Jackson became very cold to her, would sometimes not acknowledge her presence, and at one point nearly walked right into her.  Ms. Mullen testified that she believed Ms. Jackson was counseled after the first two instances, but did not know about the third.  Ms. Jackson testified that she was counseled about the third incident as well.

Many of the incidents complained of by Ms. Mullen seemed to occur in the elevator.  She described one such occasion with a co-worker, Mr. Graham.  As Ms. Mullen described it, they had been having a "very friendly and jovial conversation."  EEOC Transcript at 50 (Mullen direct).  She joked that she did not want to get off on the third floor, the one where she worked, and he said "[w]ell I'll just take that stick [referring to her cane] . . . [and] beat you off the elevator with it." *Id.* In another incident she was riding the elevator with a different co-worker, Mr. Thornberry.  Mr. Thornberry looked at her leg, asked if she was in pain and if she took pills for it.  He later received counseling from the agency about this remark.  Ms. Mullen had one complaint about the agency attorney, also on the elevator.  Ms. Mullen was riding with Ms. Waldo and at least one co-worker,

Ms. Hazlett.  According to Ms. Mullen, she was not moving fast enough for Ms. Waldo who coldly asked "are you getting off" with her hand against the "close" button of the elevator.  *Id.*  at 55-56. In a final elevator incident, Ms. Mullen was riding with Sherry Adams and LuAnne Conley (both co-workers).  Ms. Mullen testified that they were discussing elevator problems when Ms. Mullen described having to literally crawl out of a stuck elevator earlier in the day.  *Id.* at 63-64.  (It had stopped between floors and because of her limitation, Ms. Mullen could not walk out.) *Id.*  Ms. Adams started laughing, which brought Ms. Mullen to the point of tears.  *Id.* Ms. Adams later received counseling after Ms. Mullen complained about her behavior.

Other comments were made by a variety of co-workers.  Ms. Mullen complained, for example, about comments directed towards a cane her father had carved years earlier.  Some people had referred to it as a snake (even asking to pet "snakey"), others asked if she had found it in the woods or made it; some said things like "[n]ice cane.  I like that." *Id.* at 26.  To avoid the attention her original cane drew to her impairment, Ms. Mullens switched to a more generic cane sometime in 2006 or 2007 (she could not recall exactly when).  In a more extreme example, according to Ms. Mullen's version of the events, one co-worker muttered "gimpy, gimpy, gimpy" as she walked by his cubicle.   It appears, and Ms. Mullen does not dispute, that the Corps typically counseled employees about whom she filed complaints or grievances.

Ms. Mullen also complained about conduct and comments from her supervisors or those acting in a supervisory position.  Some of these incidents occurred between her and Brantley Jackson, someone she referred to as her "technical supervisor."  *Id.*  at 49. Although he is not in her actual supervisory chain, he does provide input on her performance and is involved in assigning her tasks.  *Id.* at 49, 56-57.  On one occasion he disposed of boxes around her desk and explained –

gesturing to her impaired leg – that he knew she was not going to move them.  *Id.*  The agency

counseled Mr. Jackson, who later came up and apologized to Ms. Mullen.  *Id.*  at 74 (Mullen cross).

He explained that he thought he was being helpful and that she would need assistance.  *Id.*  In a

meeting with Ms. Mullen, however, Mr. Jackson commented that she was hyper-sensitive and

offended by almost anything.  *Id.*  at 56.  As a result of her dealings with Mr. Jackson, Ms. Mullen

asked not to receive assignments from him, but this request was denied by those who were in her

supervisory chain.

Peter Dodgion served as Ms. Mullen's first line supervisor.  She testified about instances

where she felt he contributed to a hostile work environment himself.   In one instance he refused to

let her store EEOC and union material in the cubicle of a co-worker, Ms. Edomnds, despite the fact

that Ms. Edmonds consented to the storage of Ms. Mullen's boxes.  *Id.* at 74-75.   In a related

incident Mr. Dodgion directed all of his staff to clean their work areas.  *Id.* at 75-77.  Ms. Mullen

was on leave during this time and when she returned, the deadline had expired.  *Id.*  She was given

a new deadline, but denied an extension when she requested it.  *Id.*  He commented that her physical

limitation had nothing to do with her failure to clean her workspace on time.  *Id.*  Mr. Dodgion and

Ms. Mullen also clashed during her performance reviews.  *Id.* at 58-62.  She said that while he

allowed other employees to take performance appraisals to their desks for review and comment he

demanded that she sign in front of him during their meeting.  *Id.*  She testified at hearing that before

her complaints she always go along with Mr. Dodgion but that later he "acted badly" – she felt this

was reprisal.

Finally, Ms Mullen complains that she was not allotted enough official time to work on her

EEOC complaint.  She requested a total of 24 hours which she felt "was not a lot."  On the advice

of office of counsel 16 hours were approved.  As a result Ms. Mullen ended up working through lunch and staying late many nights to work on her complaint.

During the hearing Ms. Mullen made clear that the incidents she referred to specifically were only examples of the type of hostility she faced.  She said that if she listed everything that happened, "[t]hat's what [she] would spend all [her] time doing."  EEOC Transcript at 46.  She further stated that she received unwelcome "comments, stares, chuckles, glances," etc. sometimes more than once a day.  *Id.*  The specific events she enunciated all occurred between the time of the arbitration decision in her first EEOC case, on June 10, 2003, and the time of her early retirement from the Corps in the mid-2007.[5]  Although she acknowledged that most time individuals were counseled following her complaints, she was not happy with that solution, as it often led to people complained of acting cold and unfriendly towards her.  She would have preferred a more global solution, such as agency-wide training regarding treatment of people with disabilities.

---

[5]Although it is not possible to put together a precise time-frame of each incident from the information contained within hearing transcript records and depositions, the EEOC's administrative law judge was able to assign dates to certain events (using affidavits and, presumably, documentation of grievances unavailable to this Court).  According to the administrative law judge's opinion, the box-moving incident with Brantley Jackson occurred on October 23, 2003.  The elevator incident with Mr. Graham occurred on January 26, 2004.  The workspace cleaning confrontation with Mr. Dodgion occurred in January and February of 2005.  The "gimpy, gimpy, gimpy" comment was made on August 3, 2005.  The fire-drill conversation with Ms. Jackson occurred on October 13, 2005 – the complaints of unfriendliness in reprisal, sometime later.  The question by Mr. Thornberry about Ms. Mullens use of pain pills was asked on November 21, 2005.  The elevator incident with Ms. Waldo occurred on September 26, 2006.  The complained of performance evaluations took place on February 20th and February 27th 2007.  The elevator laughing by Sherry Adams occurred in May of 2007.

**Analysis**

I.      **Equal Opportunity Employment Commission Case I – Failure to Accommodate by Withholding a Requested Parking Space**

Defendant submits two arguments in support of summary judgment on this claim: first, that Ms. Mullen has no claim because she is not a individual with a disability within the meaning of the Rehabilitation Act; second, that her failure to engage in the interactive process of reasonable accommodation is fatal to her claims of discrimination.  To resolve the first issue, the Court assumes without deciding that Ms. Mullen is an individual with a disability.  The Court understands that it is Plaintiff's burden to establish that she has a physical condition which substantially limits a major life activity.  *See Bragdon v. Abott,* 524 U.S. 624 (1998); 29 C.F.R. § 1630.2(g)(1).  It is also true, as pointed out by Defendant, that this is a determination which is best suited to a case-by-case determination.  *Forrisi v. Bowen*, 794 F.2d 931 (4th Cir. 1986).  It is undisputed, however, that Ms. Mullen had some functional limitation in her ability to walk.  Walking is certainly one of the activities so "central to daily life" as to fit into the Rehabilitation Act's meaning of "major life activity."  *See Wilson v. Phoenix Specialty Mfg. Co., Inc.* 513 F.3d 378, 384-85 (4th Cir. 2008) (quoting *Toyota Mtr. Mfg., Ky., Inc. v. Williams,* 534 U.S. 184 (2002)).[6]  Whether her condition "substantially" limits this major activity is a question best left unaddressed as the Court can decide these claims on another basis.

Defendant's second argument is that Ms. Mullen failed to engage in the interactive process. In order to determine an appropriate reasonable accommodation it is often necessary for an employer

_____

[6]Although both *Wilson* and *Toyota Mtr. Mfg.* were interpreting provisions of the Americans with Disabilities Act (ADA), the standards used to determine whether the Rehabilitation Act has been violated are generally those applied under Title I of the ADA.  *See* 29 U.S.C. § 791(g); *see also, Hooven-Lewis v.v Caldera*, 249 F.3d 259, 268 (4th Cir. 2001).

-11-

to engage in an informal but interactive process to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130 (7th Cir. 1996) (citing 29 C.F.R. § 1630.2(o)(3)). "Where the missing information is of the type that can only be provided by one of the parties, failure to provide the information may be the cause of the breakdown and the party withholding the information may be found to have obstructed the process." *Id.* Defendant contends that the Corps attempted to engage in the interactive process, but that it broke down when Ms. Mullen failed to provide any current medical information regarding the nature and extent of her injury. While Defendant concedes that Ms. Mullen submitted documentation from 1992-1993 establishing a "permanent" limitation in her ability to walk, it argues that it was already accommodating that limitation through the 1993 and 1995 negotiated settlement agreements.

Plaintiff proffers several arguments in response to Defendant's contention that she was responsible for the breakdown in the interactive process. Ms. Mullen points out that Mr. Lycan, one individual responsible for determining whether a reasonable accommodation was necessary, did not dispute that her condition was permanent. Although she did not submit any current medical documentation when she made her request for a parking space in 2000 and 2001, Mr. Lycan himself had seen her using a wheel-chair at or around the time the request was made. She further notes that Mr. Lycan is not a doctor and argues that this disqualifies him from making decisions regarding the extent of her limitation or her status as a qualified person with a disability. While conceding that she did not submit medical information any more recent that 1992 or 1993, Ms. Mullen argues that any submission of further material would have been futile. She contends that the decision to deny her the parking space had already been made, as evidenced by Ms. Quinn's remarks that she

personally did not believe Ms. Mullen should receive the space and Mr. Lycan's request to have the handicapped parking signs near the requested space removed. Finally, Ms. Mullen argues that it was not she, but rather the Corps, who broke down the interactive process. She submitted documentation which established the permanency of her condition and this was never disputed by the Mr. Lycan or anyone else at the Corps.

Fatal to Ms. Mullen's claim is the fact that the Corps had already made accommodations for the permanent injury referred to in 1992 and 1993 medical information through the 1993 and 1995 negotiated settlement agreements. Under the terms of these agreements she was allowed to structure her work schedule so that she would be sedentary the first and last forty minutes of day. *See* Negotiated Settlement Agreement (Def.'s Ex. A, Doc. 75 Attach 1). This accommodation was made so that she could comply with a physician's recommendation not to walk for more than fifteen to twenty minutes at a time. September 19, 2001 Memorandum (Def.'s Exh D. Doc. 75-1). This accommodation specifically allowed Ms. Mullen to rest for the recommended period of time after walking to the federal building from her usual parking location. *Id.* In none of Ms. Mullen's arguments does she challenge the reasonable nature of this arrangement to accommodate her limitation. Although the Corps, and Mr. Lycan specifically, recognized the permanent nature of Ms. Mullen's condition, they understood that accommodations had already been made. Without more specific information about an increased or additional limitation, there was no duty to alter the existing accommodation or establish a new one.

It was not necessary for Mr. Lycan to have been trained in medicine to make a determination regarding an appropriate accommodation for Ms. Mullen's limitation. Rather, it was Ms. Mullen's duty to assist him in identifying the "precise limitations resulting from the disability" so that both

she and Mr. Lycan (or another at the Corps) could engage in an interactive process to identify a reasonable accommodation. *See generally, Beck*, 75 F.3d 1130. This process occurred in 1993 and 1995 when the Corps made accommodations to Ms. Mullen's documented limitations, and specifically agreed to accommodations in accordance with her physician's recommendations. While Mr. Lycan had seen Ms.Mullen using a wheelchair at or around the time of her request for the parking space, this cannot substitute for the precise type of information – such as doctor's recommendations or other medical information – which would help Mr. Lycan and the Corps determine the extent of Ms. Mullen's limitation and establish a reasonable accommodation.

The Court is unaware, and the Plaintiff fails to cite, any authority that recognizes futility as a defense for failure to engage in the interactive process. Responsibility for identifying an accommodation is shared by both an employer and employee. *Id.*; *see also, May v. Roadway Express, Inc.* 221 F.Supp.2d 623, 627-28 (D.Md. 2002). A party that fails to communicate is not acting in good faith to engage in this process and to find a solution. *See Beck*, 75 F.3d 1130; *Bultemeyer v. Fort Wayne Cmty. Sch.,* 100 F.3d. 1281, 1285 (7th Cir. 1996). When one party breaks off communication because it assumes the other will not respond as hoped, it is the party breaking off communication who is responsible for the failure of the interactive process and any failure to find a reasonable accommodation.

The Court would finally note that while an employer has a duty to provide a "reasonable accommodation" that allows a disabled employee to perform the essential functions of her position, it is under no duty to provide the specific accommodation requested or even the best accommodation available. *O'Grady v. Zurich Holding Co. of America*, 12 Fed. Appx. 96 (4th Cir. 2001); *Walter v. United Airlines, Inc.*, 2000 WL 1587489 (4th Cir. 2000) (unpublished). Clearly Ms. Mullen wanted

a parking space next to the building in which she worked.  The Corps was under no obligation to give it to her if it could reasonably accommodate her limitation in another manner.  Ms. Mullen has made no showing that either the existing accommodation was unreasonable or that she suffered an additional limitation above and beyond that which had already been accommodated.  For all of these reasons, the Court **DENIES** Ms. Mullen's claims based on the Corps' failure to accommodate her disability by withholding a requested parking space.

## II.  EEOC Case 2 – Claims for Disability Discrimination and Reprisal by Subjecting Plaintiff to a Hostile Work Environment

Ms. Mullen's claims for disability discrimination and reprisal through a hostile work environment fail for two reasons – one substantive and one procedural.  Each of these stands on its own as an independent and justifiable reason for the denial of her claim.  The Court will discuss both as alternative bases for denial of her claims.

### A.  Alleged Discriminatory Conduct Is Not So Severe and Pervasive As to Alter the Conditions of Employment and Satisfy a Requisite Element of A Hostile Work Environment Claim.

In order to establish a hostile work environment claim, a claimant must show that alleged conduct: "1) was unwelcome; 2) resulted because of her gender, disability, or prior protected activity; 3) was 'sufficiently severe or pervasive' to alter the conditions of her employment; and 4) was imputable to her employer." *Pueschel v. Peters*, 577 F.3d 558, 564-65 (4th Cir. 2009) (quoting *Ocheltree v. Scollon Prods., Inc.,* 335 F.3d 325, 338 (4th Cir. 2003)).  The first element is subjective,

-15-

but the remaining three must all be evaluated on an objective "reasonable person basis."[7] *Id.* (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17 (1993).

Here, Ms. Mullen's claims fall on the third required element.  Conduct may be "sufficiently severe or pervasive to alter the conditions fo the victim's employment and create and abusive working environment" when the workplace becomes "permeated with discriminatory intimidation, ridicule, and insult."  *Harris,* 510 U.S. at 21.  A determination of severity or pervasiveness of offensive conduct must take into account the totality of the circumstances.  *Id.* at 22.  Factors which should be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.*  A court may also weigh the effect of the employee's emotional well-being.  *Id.*  In evaluating the circumstances, a court must recognize that there is no federal cause of action for unpleasantness; an employee is only guaranteed a workplace free of objective hostility and abuse.  *Hartsell v. Duplex Prods., Inc.* 123 F.3d 766 (4th Cir. 1997).

Even taken in the light most favorable to Ms. Mullen, most of the complained of conduct would not have been offensive, much less hostile or abusive, to an objective reasonable person. Although Ms. Mullen clearly would have preferred that her mobility impairment never be referred to in the workplace, the fact that co-workers mentioned her impairment is not actionable.  On its face some of the conduct described by Ms. Mullen seems to be an expression of concern for her condition.  Mr. Thornberry's question about the pain in her leg, and whether or not she takes

---

[7]The third prong technically contains both a subjective and objective component. *Anderson v. GDC, Inc.*, 281 F.3d 452, 459 (4th Cir. 2002).  The complained of conduct must not only be objectively sufficiently severe or pervasive, but also perceived as such.  Here, however, there is no dispute that Ms. Mullen perceived her workplace to be severely and pervasively hostile.  It is only the objective component of this prong which must be considered by the Court.

medication, falls within this category.  Many comments, though they brought up her limitation, were simply innocuous – such as questions about her cane, or Ms. Jackson asking whether special consideration during a fire drill was given to people who had trouble walking.  Even the comment by Mr. Graham that he would take her stick and beat her off the elevator cannot be taken as anything other than an attempt (perhaps ill-considered) at a joke, when it occurred in the midst of a conversation described by Ms. Mullen, herself, as "very friendly and jovial" and in response to Ms. Mullen's own joke.  EEOC Transcript at 50.

Ms. Mullen complains of many instances where people were simply unfriendly, and she attributes their coarse attitude as reprisal.  The third incident involving Ms. Jackson – who nearly walked into Ms. Mullen – and Ms. Waldo – who "unkindly" asked if she was getting off the elevator, fall into this category.  This behavior, while undoubtedly unpleasant, is not the kind of actionable behavior upon which a claim for discriminatory reprisal can be built.  An employer cannot force its employees to get along nor can a federal court order compensation based on a lack of courtesy.

Ms. Mullen undoubtedly had clashes with management in her office.  The Court, however, struggles to see how many of these incidents had anything to do with her physical limitations.  Clearly she and her supervisor had different standards regarding the cleanliness of her work environment, but being forced to maintain a tidy cubicle is not discriminatory behavior – particularly where there is evidence that it was a standard imposed on the entire office.  Neither is denying an employee permission to take performance appraisal back to her desk, or granting less than the requested official time to work on a complaint against the employee – when there is not evidence that these actions were unreasonable or motivated by a retaliatory animus.

-17-

There are a scant few instances that might be considered patently offensive to an objectively reasonable person.  The "gimpy, gimpy, gimpy" comment and laughter at Ms. Mullen for having to crawl out of an elevator are the prime examples in the record.  At worst, however, these are isolated incidences of offensive utterances.  While the Court recognizes that Ms. Mullen could not be expected to list every single occurrence of unwelcome or offensive conduct, it is likely that the specific incidents she testified about were the most egregious in her mind and the ones over which she filed grievances.  When so much of the behavior at the extreme end is inoffensive on an objective reasonable person standard, the totality of the circumstances cannot be found to be pervasively severe and hostile based on a few mean comments occurring over a three to four year time-span.

Taking into account the *Harris* factors – " the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; . . . whether it unreasonably interferes with an employee's work performance" and the effect on the employee's emotional well-being – the Court must **FIND** that Plaintiff has failed to provide evidence to support her claims of a hostile work environment.  At worst, a few comments would be considered offensive to an objectively reasonable person, these comments were isolated and "mere offensive utterance[s]" rather than verbal threats or humiliation.  Further, there is no evidence that any of the complained of behavior unreasonably interfered with Ms. Mullen's work performance.  On the contrary, it appears from the record that the Corps made efforts to ensure that the workplace was non-discriminatory and not detrimental to Ms. Mullen's performance.  When Ms. Mullen made complaints and filed grievances they were taken seriously by the agency:  the individuals named were counseled, and there were few repeat offenders.  Indeed many of the complaints resulted in

personal apologies directly to Ms. Mullen.  On this record, the Court cannot infer a hostile work environment.  It is unfortunate that Ms. Mullen found the Corps to be an unpleasant place to work, but much of that unpleasantness must be attributed to her own heightened sensitivity and proclivity to engage the grievance system.

      B.  <u>Plaintiff's Petition for Review of Her Second EEOC Decision Was Untimely Filed</u>

While Plaintiff's claim based on a hostile work environment fails on the element of severity and pervasiveness, it is alternatively denied because it was untimely filed.  The original complaint in this action was filed on February 15, 2008, prior to entrance of judgment in her second EEOC case.  The decision in that case was announced by the administrative law judge on February 20, 2008, judgment was entered on February 22, 2008, and the FAD implementing the administrative law judge's decision was filed on April 7, 2008.  Pursuant to 29 C.F.R. § 1614.407, an appeal to the district court would have bene proper any time within 90 days of receipt of the final action.  Plaintiff received the FAD on April 9, 2008 (a fact not in dispute) but did seek to amend her complaint in this Court to add claims stemming from that action until July 23, 2008 – more than two weeks after the expiration of the ninety-day deadline.

Plaintiff argues that the late amendment should be excused – either because the amended complaint "relates back" to the first, or because of equitable tolling. Both the these justifications, however, are unavailing.  While amendments may sometimes relate back to an original complaint so as to avoid a time-bar, *see Jones v. Greenspan*, 445 F.Supp.2d 53 (D. D.C. 2006), one untimely complaint cannot be made proper by relation back to another untimely complaint.  Any hostile work environment claims in Ms. Mullen's original complaint were filed before her administrative claims were exhausted.  *See Young v. National Center for Health Servs. Research,* 828 F.2d 235 (4th Cir.

-19-

1987) (explaining the requirement of administrative exhaustion).   While Plaintiff's complaint was filed on February 15, the EEOC decision considering her hostile work environment claims did not become final until April 7, 2008.[8]   Likewise, Plaintiff cannot take advantage of any equitable tolling of the deadline.   She has been represented by competent counsel since the early stages of the administrative process and offers no compelling excuse for her failure to timely file.   For this reason, as well as those explained above, Plaintiff's claim based on a hostile work environment must be **DENIED.**

### Conclusion

For the reasons explained above, the Court **GRANTS** the Defendant's motion for summary judgment.  (Doc. 75).   The Court has read and considered all of the evidence in the record as well as Ms. Mullen's sur-reply but still cannot find a basis for allowing claims for failure to accommodate or disability discrimination to go to the jury.   Additionally, the Court **DENIES** Plaintiff's Motion for Reconsideration (Doc. 104).   The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:    February 2, 2010

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

---

[8]Earlier claims of a hostile work environment were conclusively resolved by an arbitrator and neither before the EEOC nor this Court.

-20-